AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. **1:21-MJ-00053** |
| *or identify the person by name and address)* | ) | |
| INFORMATION ASSOCIATED WITH THE CELLULAR | ) | |
| DEVICE ASSIGNED CALL NUMBER 513-953-5123 that | ) | |
| is stored at premises controlled by SPRINT | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference).

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922(g)(1); 18 USC 1512(c)(2)); 18 USC 1503; 18 USC 371; 18 USC 1623(a) | Felon in possession of firearm or ammunition; Witness tampering; Obstruction of justice; Conspiracy to commit obstruction of justice; Perjury |

The application is based on these facts:

See attached affidavit of ATF Special Agent Edward Schaub.

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Edward Schaub, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
**FaceTime Video** _____ *(specify reliable electronic means).*

Date: **Jan 20, 2021**

_____
*Judge's signature*

City and state: Cincinnati, Ohio

Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number 513-953-5123 ("the Account"), that are stored at premises controlled by Sprint ("the Provider"), headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **September 19, 2019, through March 1, 2020, and September 1, 2020 through present:**

a.  The following information about the customers or subscribers of the Account:

    i.  Names (including subscriber names, user names, and screen names);

    ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.  Local and long distance telephone connection records;

    iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.  Length of service (including start date) and types of service utilized;

    vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

   b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 922(g) (Felon in Possession of a Firearm) by Darias JACKSON on or about **September 19, 2019**; and violations of 18 U.S.C. §§ 2, 371, and 1503 (Conspiracy to Obstruct Justice); 18 U.S.C. §§ 2 and 1503 (Obstruction of Justice); 18 U.S.C. §§ 2 and 1512(c)(2) (Witness Tampering); and 18 U.S.C. § 1623(a) (Perjury) by Darias JACKSON, Jessica BROWN, Gregory JACKSON, Jearid IRVIN, and/or other unknown persons from on or about **September 19, 2019, through March 1, 2020, and September 1, 2020, through present.**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the

government in this investigation, and outside technical experts under government control) are
authorized to review the records produced by the Provider in order to locate the things
particularly described in this Warrant.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 513-953-5123 THAT IS STORED AT PREMISES CONTROLLED BY SPRINT | Case No. **1:21-MJ-00053** <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Edward Schaub, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **513-953-5123** ("the **Target Cell Phone**") that is stored at premises controlled by Sprint Corp., a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, KS 66251. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Sprint to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I have been employed with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as a Special Agent since September of 2014 and am currently assigned to the ATF Organized Crime Squad.  I am a graduate of the Criminal Investigator Training Program and Special Agent Basic Training in Glynco, Georgia.  Prior to becoming a Special Agent, I was a Hopkinsville Kentucky Police Officer for eight years and was an ATF Task Force Officer assigned to the Western Kentucky Gun Crimes Task Force in Christian County, Kentucky. I am a graduate of the Department of

Criminal Justice Training Center in Richmond, Kentucky. During my employment with ATF, I have been involved in numerous investigations of violations of federal and state criminal laws resulting in multiple successful prosecutions. My investigations routinely involve the collection and analysis of evidence obtained from cellular telephones.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that Darias JACKSON has violated 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) and that JACKSON, Jessica BROWN, Greg JACKSON, and Jearid IRVIN have violated, are violating, and will continue to violate 18 U.S.C. §§ 2, 371, and 1503 (Conspiracy to Obstruct Justice); 18 U.S.C. §§ 2 and 1503 (Obstruction of Justice);18 U.S.C. §§ 2 and 1512(c)(2) (Witness Tampering); and 18 U.S.C. § 1623(a) (Perjury). There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

## PROBABLE CAUSE

**A.      ATF and the U.S. Attorney's Office are investigating a shooting that occurred in September 2019, as well as attempts to obstruct that investigation by Jearid IRVIN and others.**

5.      As I describe in more detail below, ATF and the U.S. Attorney's Office for the Southern District of Ohio are investigating a shooting that occurred in the early morning hours of September 19, 2019. Based on the investigation to date, I believe that Darias JACKSON ("JACKSON") was the shooter. I also believe that, after the shooting, JACKSON and his girlfriend, Jessica BROWN, and JACKSON's brothers Gregory JACKSON ("G. JACKSON") and Jearid IRVIN, along with other

2

unknown individuals, conspired to obstruct the government's investigation into the shooting, including by conspiring to pay the shooting victim (the "Victim") to recant his identification of JACKSON as the shooter. I believe that G. JACKSON and IRVIN helped obtain the Victim's recantation by bringing a typewritten affidavit to the Victim's hospital room, which was part of the plot to thwart the criminal prosecution against JACKSON. I further believe G. JACKSON and his coconspirators' attempts to obstruct the government's investigation are ongoing.

      **B.**     **On September 19, 2019, the Victim was shot several times in the parking lot outside an apartment on Groesbeck Road in Cincinnati.**

      6.      At approximately 3:09 am on September 19, 2019, a 911 caller reported that a victim (the "Victim") had been shot near an address on Groesbeck Road in Cincinnati, Ohio. While officers were on their way, they received reports that someone had recently arrived at the hospital suffering from multiple gunshot wounds.

      7.      Officers located nine 9 mm casings and blood in the parking lot in front of the apartment on Groesbeck Road. The ammunition associated with these casings was manufactured outside the State of Ohio. Investigators never found the firearm used to shoot the Victim.

      8.      Shortly after his/her arrival at the hospital, the Victim was taken into surgery and was unable to provide any statements to officers for several days.

      **C.**     **On October 2, 2019, the Victim identified JACKSON as the shooter.**

      9.      On October 2, 2019, when shown a 6-pack of photographs, the Victim identified Darias JACKSON as the shooter and said he/she had known JACKSON for many years.

      10.     At the time of the shooting on September 19, 2019, JACKSON was on federal supervised release in connection with his 2013 conviction for Conspiracy to Possess with Intent to Distribute 1,000 Kilograms or More of Marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A), a Class A

felony punishable by more than one year in prison.  JACKSON was sentenced to 50 months'

imprisonment for that offense.

> **D.   On October 31, 2019, two men, including JACKSON's brother Jearid IRVIN, brought a typewritten affidavit to the Victim in which the Victim recanted his previous identification of JACKSON as the shooter.**

11.     On October 31, 2019, a notary public for the hospital where the Victim was being treated

was called to the Victim's room to notarize a statement in which he/she recanted his/her identification of

JACKSON as the shooter.

12.     Upon entering, the notary saw six people in the room: the Victim, who was sitting in

his/her bed with his/her legs dangling over the side; three individuals on a love seat who the notary

believed were likely the Victim's parents and a sibling; and two males whom she did not now in the

back of the room.  The notary stated that the two men in the back of the room brought the typewritten

affidavit to her.  The Victim told the notary that he/she had read the affidavit.  The notary then asked

three questions to determine whether the Victim was competent to sign the affidavit ("Who is the

president of the United States?"  "Where are you?" and "What is today's date?").  After receiving

satisfactory responses, the notary reviewed the affidavit with the Victim and noted to him/her that it

appeared the Victim was recanting a previous statement.  The Victim responded that he/she was

recanting because the person the Victim had accused was the Victim's cousin and it was the first name

he/she had thought of after the shooting and that was why he/she said the name originally.  According to

the notary, the Victim stated, "He's my boy; it was not him."  When one of the individuals the notary

believed were the Victim's parents asked what the Victim was signing, the Victim responded that it was

just paperwork for the hospital.

13.    The Victim signed the affidavit, and the notary notarized it.  As soon as the document was notarized, the two men in the back of the room stepped forward, took the signed statement, and walked out of the room.

14.    Several weeks later, on December 19, 2019, JACKSON's state defense attorney filed the notarized affidavit in a motion to dismiss the state case against JACKSON.[1] As a result of the Victim's recantation, as well as the Victim's subsequent failure to appear in Ohio state court on January 8, 2020 for a jury trial on JACKSON's state charges, the state of Ohio dismissed the criminal charges against JACKSON relating to the September 19, 2019 shooting without prejudice.

15.    Later, as the investigation into the shooting and subsequent obstruction continued, law enforcement learned from a confidential witness, CW-1,[2] that the Victim had told him/her that one of the two men who provided the affidavit to the Victim in the hospital was JACKSON's brother Jearid IRVIN. CW-1 was not sure who the second man was; however, based on the evidence I describe below, I believe the second individual was likely JACKSON's other brother, G. JACKSON.

**E.    On January 8, 2020, the Victim reaffirmed that JACKSON was the shooter.**

16.    In a telephone interview with law enforcement on January 8, 2020 after the dismissal of Ohio's case against JACKSON in state court, the Victim again identified JACKSON as the shooter, saying that he/she had been on a substantial amount of pain medicine when he/she signed the affidavit on October 31, 2019.

---

[1] Ohio charged JACKSON in connection with the September 19, 2019 shooting in Hamilton County Court of Common Pleas Case No. B1905606.

[2] CW-1 was convicted of drug trafficking once in the mid-1990's and again in the early 2010's. Apart from these felony convictions, CW-1 has a couple of misdemeanor convictions that are more than a decade old. None of his/her criminal history involves crimes of dishonesty.

**F.**     **A video taken moments before the shooting appears to show the Victim and JACKSON in an aggressive verbal confrontation.**

17.     After the shooting, but before the Victim was medically stable and could be interviewed, law enforcement received anonymous tips that someone had taken video of a confrontation between the Victim and JACKSON shortly before the shooting.

18.     Law enforcement later obtained a copy of the video, which shows two individuals who strongly resemble the Victim and JACKSON in an aggressive verbal confrontation.  The two individuals appear to be standing in the parking lot outside the Island Breeze Apartments on Groesbeck Road, near where the Victim was shot.

19.     The video's metadata show that the video was taken at 3:06 am—approximately three minutes before the 911 call reporting that the Victim had been shot.  The video also partially shows a vehicle that is consistent in appearance with a vehicle registered to JACKSON; the person who appears to be JACKSON is sitting on that vehicle in parts of the video.  Because the video appears to have been taken from inside an apartment, while the two individuals were outside in the parking lot, the individuals' words cannot be clearly heard.

**G.**     **Jail calls revealed that JACKSON instructed BROWN to testify falsely when BROWN was subpoenaed to testify before the grand jury.**

20.     On July 7, 2020, I called JACKSON's girlfriend, BROWN, and left a message asking her to call me back so that I could arrange to serve her with a subpoena for her testimony at a federal grand jury proceeding.

21.     That afternoon, before BROWN returned my call, BROWN first spoke to JACKSON on a recorded jail call that JACKSON placed to BROWN's personal cell phone ending in 5859 (the "5859 Phone"). In this call, JACKSON instructed BROWN to call me (Agent Schaub) back "right now" and said that she did not need to comply with a subpoena. They arranged for JACKSON to call JACKSON's

6

personal cell phone ending in 5587 (the "5587 Phone"), which was in BROWN's possession, so that BROWN would be on the phone with JACKSON and me simultaneously, but using two different cell phones. In other words, BROWN had both her personal phone, the 5859 Phone, and JACKSON's personal phone, the 5587 Phone, at the time she returned my call. BROWN used her personal phone to return my call, but first arranged for JACKSON to call the 5587 Phone so she would be on the phone with JACKSON for the entirety of her call with me.

22.     Jail call records reflect that after calling BROWN on the 5859 Phone (i.e., after the call on which they discussed the plan for BROWN to call me back), JACKSON hung up and immediately called the 5887 Phone (which, again, was in BROWN's possession) as planned. While BROWN was speaking to JACKSON using the 5887 Phone, BROWN simultaneously called me from her phone, the 5859 Phone. I believe BROWN placed my call with her on speakerphone so that JACKSON could hear what we were saying because in the recorded audio from the 5587 Phone call I can hear my voice as I am speaking to BROWN.

23.     JACKSON and BROWN spoke several times in the twenty-four hours immediately preceding her grand jury testimony, which occurred on July 8, 2020. Over the course of these phone calls JACKSON made numerous statements instructing BROWN not to comply with the subpoena, including telling her what answers to give to the prosecutors conducting the questioning and telling her to withhold information.  BROWN acknowledged JACKSON's instructions and agreed with his proposal.

24.     Within hours of BROWN's grand jury testimony, an inmate at the jail called her "for DJ" to "make sure you are alright" and to see "how did everything go."  BROWN indicated that everything was fine. Later that night, when she and JACKSON spoke on the phone in another recorded jail call, she repeated the questions asked of her and told JACKSON what her answers were. She said that she did not

7

have to "plead the Fifth" because "they were asking stupid [expletive]" and nothing about the questioning stood out apart from a question about a telephone call she made to JACKSON the night of the shooting.

25.     I know, based on my review of dozens of recorded jail calls between JACKSON and BROWN, that JACKSON and BROWN frequently discuss the pending investigation and prosecution against JACKSON. I also know, based on my review of dozens of recorded jail calls between JACKSON and BROWN, that JACKSON has instructed BROWN to place various phone calls to other individuals using his cell phones, and BROWN has complied. I also know that they often speak in ways that are consistent with purposefully vague and coded language designed to thwart law enforcement from being alerted to their true topic of conversation. For example, I know in one recorded jail call from October 2019, in which JACKSON called BROWN on BROWN's personal phone, JACKSON instructed BROWN to use one of his cell phones to place a call to a third party. BROWN placed the call using JACKSON's cell phone and no one answered, but shortly thereafter BROWN received a call back on JACKSON's cell phone from that third party. After BROWN answered and then ended the call she had just received on JACKSON's cell phone, JACKSON asked her, "You know what he's talking about, don't you?" BROWN responded, "Yeah, I got you." Some of this portion of their exchange is unintelligible, but BROWN appeared to reassure JACKSON that she had "repeated" JACKSON's statements to the caller. Then JACKSON told BROWN that "the DVDs" are "three dollars" each, "you know what I mean?" But if someone wants to "rent DVDs," that's "two dollars a day," or "at least a dollar ninety cent, you know what I mean?" JACKSON verified that BROWN had "heard" him, and BROWN responded in the affirmative. Jackson repeated the pricing he had just described, then continued, "But if he's trying to buy the whole DVD with all the episodes on it, he can just give you— he can just give you three dollars." JACKSON repeated this pricing information several times and got

8

confirmation that BROWN understood. Based on my training and experience, and my knowledge of JACKSON and the investigation thus far, I do not believe that DVDs are the true subject of their conversation. Therefore, I believe that JACKSON and BROWN are cognizant of the fact that these calls are monitored and make efforts to disguise their meaning.

26.     Based on my training and experience, and based on my review of JACKSON's recorded jail calls and my meetings with BROWN, I believe that JACKSON instructed BROWN not to testify fully and completely in order to frustrate the grand jury's investigation. I also believe that JACKSON and BROWN are aware that their jail calls are recorded and speak in coded language during those calls.

**H.  A search warrant for two phones seized from BROWN revealed evidence from October 2020 of a scheme in which G. JACKSON paid the Victim to recant his identification of JACKSON.**

27.     In October 2020, BROWN was arrested. Incident to her arrest, agents located two Apple iPhones. On October 28, 2020, in Case No. 1:20-MJ-00779, the Honorable Karen Litkovitz, U.S. Magistrate Judge, signed a search warrant authorizing the search of these two phones.

28.     One of the two Apple iPhones is BROWN's personal cell phone, with call number ending in 5895. My review of the forensic analysis of this phone revealed multiple text messages between BROWN and an individual using phone number 513-858-5005. I believe that the individual using the 513-835-5005 phone is the Victim, because the contact is listed in BROWN's phone as "[Victim's nickname] {for DJ}", and because the content of the messages leads me to believe that the two are discussing a scheme in which JACKSON and a coconspirator paid the Victim to recant his statement incriminating JACKSON. For example, the following are text messages exchanged between BROWN and the Victim on October 10, 2020:

> **Victim:**          Cuz when my cousin call tomorrow tell him I was suppose to meet with bruh n den meet that lady but bruh switched up wat he saying or sum [unidentified emoji] tell em it ain't nun doe

**BROWN:**          Switched up what?

**Victim:**          Just a misunderstanding about everything I guess I'll call g later n see what's up ….. but look doe I sent bruh dis [Attachment below]



| | |
|---|---|
| **Victim:** | Like bruh I already did wat I was suppose to hit his charges dismissed regardless of who ever else said different I said thst n he beat that case this fed shit is new to me … but I still a look out for bruh befor he be doing a zillion years or a accident ….. but not if a mf tryna play me again Jessica it don't make sense when. I can just be silent like I've been this whole time that [JACKSON's defense attorney]³ lady said that would help him doe a lot. |
| **Victim:** | G told me I'll get str8 once I walk n the courtroom like that shit just sound like some perpin shit but the funny par is im willing to speak on cuz behalf |
| **Victim:** | I'll go speak on his behalf on the strength fucc the money I thought bruh was looking out on the strength of his mistake Jessica I'm fucced up surgeries n shit allat …. N fr dat was my mf brother bruh like this nothing never pose to cane between us I know that nugga heart man he salt asf 2 tell em I still love em tf |
| **BROWN:** | Ima call you n a min |

29.    I believe, based on my training and experience, and my knowledge of the investigation to date, that in the above text messages, when the Victim said, "I already did wat I was suppose to hit his charges dismissed," he meant that he had helped get JACKSON's state charges dismissed by signing an affidavit recanting his identification of JACKSON as the shooter and then failing to appear to trial.

30.    I also believe that the attachment the Victim sent to BROWN, depicted above, is a screenshot of an iPhone conversation between the VICTIM and G. JACKSON, JACKSON's brother. The contact is identified as "Greg Jizzle"; "Greg" is G. JACKSON's first name, and "Jizzle" is a nickname for JACKSON.⁴ I believe that the Victim sent this screenshot of his conversation with G. JACKSON to BROWN to demonstrate that the Victim was owed money in exchange for not

---

³ As described in more detail below, the Victim uses a misspelling of the first name of one of JACKSON's defense attorneys of record. Based on other text messages and voicemails left by this defense attorney on BROWN's phone, as well as other communications between BROWN and the Victim, the context leads me to believe that the Victim is referring to JACKSON's defense attorney, and not another individual with the same first name.

⁴ The alias "Jizzle" is included in a 2013 federal indictment against Darias JACKSON.

cooperating in the prosecution against JACKSON. The Victim also included a photograph of the state court charges against JACKSON for the September 19, 2019 shooting to further underscore that the payoff was in reference to getting JACKSON's charges dismissed.

31.     I also believe that, when the Victim said, "I can just be silent like I've been this whole time[.] [T]hat [JACKSON's defense attorney] lady said that would help him doe a lot," he meant that one of JACKSON's attorneys of record had told him—or at least he had understood from the conversation—that remaining silent would help JACKSON. I believe that the person he references, whose name I have redacted in this affidavit, is one of JACKSON's attorneys of record, because (1) the redacted name is a misspelling of the first name of one of JACKSON's attorneys; and (2) my review of BROWN's phone also revealed multiple text messages and voicemails from this attorney in which the attorney repeatedly asks BROWN to facilitate a meeting between JACKSON's lawyers and the Victim. I also reviewed other text messages between BROWN and the Victim about the Victim meeting with defense counsel. In one message to BROWN, the Victim says he spoke to the attorney I referenced above.

32.     The Victim and BROWN also communicated via text message on October 20, 2020. These messages include the following exchange:

| | |
|---|---|
| **Victim:** | G ask how much I told em 8 jizzle already gave me 7 last year … I guess he ain't tryna do that for bruh or it just everything n me telling me like cuz tryna spend u like last time … I don't get it |
| **BROWN:** | Sheesh I ain't know anything about 8 |
| **Victim:** | 7 plus 8 that's 15 cuz coulda gave me close to that doe I'm tryna get my living shit together |
| **Victim:** | It was 15 from jump doe |
| **Victim:** | Half now half later was da agreement |

12

**Victim:**                       Brought me 7 said it was 7500 but it was 7

33.      As noted above, I know from prior investigations of JACKSON that "Jizzle" is one of his nicknames. I believe, based on my training and experience and my knowledge of the investigation to date, that in the above text messages the Victim was describing being paid money by JACKSON in exchange for helping JACKSON evade criminal prosecution. Specifically, when the Victim said, "G ask how much I told em 8 jizzle already gave me 7 last year," and then "7 plus 8 that's 15 cuz coulda gave me close to dat doe," I believe he meant that the agreement was for $15,000.00, with half paid to the Victim up front and half later. I believe that the Victim was telling BROWN that he was still owed $8,000.00, which reflects that "jizzle" (JACKSON) had already paid the Victim $7,000.00. I further believe (based on the screenshot above, showing the conversation with "Greg Jizzle") that "G" is a reference to G. JACKSON, and that in the above exchange the VICTIM was explaining to BROWN that the Victim had been in touch with G. JACKSON regarding the $8,000.00 the Victim was still owed.

34.      I also believe that, when the Victim said, "Just a misunderstanding about everything I guess I'll call g later n see what's up," he meant that he would call a third party—whom he referred to as "g"—about the scheme to pay the Victim to recant his identification of JACKSON. As explained above, I believe "g" refers to G. JACKSON.

35.      In another message, the Victim exchanged the following texts with BROWN:

**Victim:**                       Wasup with cuz u talk to him … got surgery coming up

**Victim:**                       Is they gone let him out

**BROWN:**                    Waiting on him to call. When is your surgery?

**BROWN:**                    Idk if they letting him out they waiting to hear from you I guess

**Victim:**                       Yea they should let him out for usre after I talk to her my surgery n 2 weeks….

| | |
|---|---|
| **Victim:** | Why they ain't let him out when I sign that paper n got his charges dismissed |
| | [. . . .] |
| **BROWN:** | Feds picked up the case, on the other end it's all good |
| **Victim:** | Ok Shiid can we do that the same day we go see that lady u can take me or wateva or meet me or she a come to us at dee dee hz |

36.     Based on my training and experience and knowledge of this case, including the context of these messages, I believe that when the Victim said, "can we do that the same day we go see that lady," he was referring to a joint meeting between the Victim, BROWN, and JACKSON's attorney of record. I further believe that when the Victim said, "u can take me or wateva or meet me or she a come to us," he meant that BROWN could take him to the meeting with JACKSON's counsel.

**I.      The search of BROWN's personal cell phone seized in October 2020 also revealed evidence that, contrary to her representations, BROWN had communicated with both IRVIN and G. JACKSON as recently as Fall 2020.**

37.     I know that in July 2020 BROWN represented to law enforcement that she was unfamiliar with JACKSON's family. Specifically, when asked if she knew who JACKSON's brothers were, she said she only knew that he had three. After additional questioning, BROWN admitted she knew that one of JACKSON's brothers is named "Greg," but she claimed not to know the names of his other two brothers. BROWN also said she did not know whether JACKSON's brothers lived in Cincinnati, Ohio, and that she had only ever met Greg.

38.     My review of the cell phone seized from BROWN in October 2020 leads me to believe that BROWN was lying and that, in fact, she knows IRVIN (the user of the **Target Cell Phone**) and G. JACKSON well, that she communicates with them frequently, and that she was in contact with them shortly before her phone was seized in October 2020.

14

39.     First, I found that the **Target Cell Phone** is saved under BROWN's contacts as "Jearid." "Jearid" is the first name of one of JACKSON's brothers, Jearid IRVIN. The text message chain with "Jearid" starts in February 2020—months before BROWN told law enforcement she did not know IRVIN. In text messages from May 2020, BROWN refers to "Jearid" as a "brother," which is consistent with the relationship between BROWN and JACKSON, which would make "Jearid" akin to a brother-in-law. (As stated above, BROWN and JACKSON have been dating since they were in high school, and the oldest of their three children is approximately ten years old.) Additionally, the user of the **Target Cell Phone**, "Jearid," refers to BROWN as "sis" in text messages from May 2020.

40.     Another text chain on BROWN's phone is with the contact "Greg (Bra)." This text chain starts in January 2020. In a text from October 2020, "Greg (Bra)" sent BROWN a text with a screenshot of an "Official Record of Benefit Payment History" for JACKSON; this screenshot includes the last four digits of JACKSON's Social Security number. In texts from June 2020, BROWN refers to "Greg (Bra)" as a "brother," which I believe is further evidence that the numbers in BROWN's phone under the contacts "Jearid" and "Greg (bra)" are indeed JACKSON's brothers IRVIN and G. JACKSON, respectively.

41.     I also reviewed text messages between BROWN and a contact labeled "My Son," who I believe is her eldest child.[5] In one text message from September 6, 2020, BROWN asks where her son is, and the son responds, "Uncle Jearid"; I interpret this to mean that the son was with IRVIN, possibly at his house. In another text from August 8, 2020, BROWN's son asks, "Can I stay here with my uncle Greg[?]."  These text messages are further evidence that BROWN was in contact with both IRVIN and G. JACKSON shortly before her phones were seized in October 2020.

---

[5] The contact in BROWN's phone labeled "My Son" is under a phone number I know is registered to JACKSON. To protect the child's privacy, I am not including any other identifying information in this search warrant application.

39. I also found evidence that BROWN communicates with G. JACKSON and IRVIN via Facebook. My review of the forensic analysis of BROWN's cell phone leads me to believe that BROWN as a Facebook account with Facebook ID 100000707406513, because this account is recorded on the device, and because the stored Facebook chats list the following participant: "100000707406513 Jessica Optimistic Brown." BROWN has a Facebook friend named "Gregory Jackson" with username "gregoryjackson." BROWN also has a Facebook friend named "Jearid Irvin" with username "jearidirvin." The source for both "Gregory Jackson" and "Jearid Irvin" in BROWN's phone is listed as "Facebook Messenger," which is a messaging application on the Facebook platform that allows friends to send each other private messages.

40. I know that, in July 2020, BROWN also falsely represented to law enforcement that she did not have a Facebook account. I believe that BROWN was purposefully attempting to keep law enforcement from scrutinizing G. JACKSON and IRVIN in connection with the investigation into the September 19, 2019 shooting. I further believe that she tried to hide the existence of her Facebook account because it may contain evidence that she conspired with G. JACKSON and IRVIN to pay off the Victim in exchange for the Victim's recantation.

41. Based on the foregoing text messages and the other evidence described above—including evidence that JACKSON's brother IRVIN (the user of the **Target Cell Phone**) was one of the men who provided the affidavit to the Victim in the hospital, and that, based on the text messages showing G. JACKSON's involvement in the scheme to pay off the Victim, G. JACKSON may have been the other individual—there is probable cause to believe that BROWN, JACKSON, IRVIN, G. JACKSON, and other unknown conspirators are engaged in a conspiracy to obstruct justice by paying the Victim to recant his identification of JACKSON as the shooter. Based on the evidence described above, including the text messages between BROWN and the Victim about a payoff from G. JACKSON, there is also

16

probable cause to believe that BROWN, the Victim, IRVIN, and G. JACKSON have been meeting in connection with the scheme and that evidence of the location of the **Target Cell Phone** would provide evidence of the scheme, including by assisting law enforcement in proving that the Victim has been meeting with IRVIN and potentially other coconspirators.

> **J.     The Victim has attempted to evade law enforcement and to avoid testifying in this matter, suggesting the scheme is ongoing.**

42.     As noted above, BROWN and the Victim were communicating as recently as October 2020—mere days before BROWN's phone was seized—about what appears to be a scheme in which JACKSON, BROWN, IRVIN, and G. JACKSON paid the Victim to recant his identification of JACKSON as the shooting.

43.     The federal case against JACKSON remains pending, with a trial currently set for February 1, 2021. Law enforcement agents have been unable to serve the Victim with a subpoena to testify at trial, in part because the Victim previously provided law enforcement with a fake phone number. Additionally, the texts set out above lead me to believe that the Victim is still awaiting another $8,000 payment from the coconspirators. I believe, based on these facts and others described above, that the scheme is ongoing and that the Victim still intends to avoid testifying against JACKSON or to testify falsely that JACKSON was not the shooter. Because the scheme is likely ongoing, and because the Victim may receive another payment from the coconspirators (which, in my training and experience, is unlikely to be an electronic payment, which is traceable), I further believe that the Victim is likely still in contact with BROWN, G. JACKSON, IRVIN, and other conspirators and that the suspects are likely meeting in person in connection with the scheme. Because the Victim remains largely incapacitated as a result of the injuries he sustained when JACKSON shot him, I further believe it is likely that G. JACKSON, IRVIN, and/or other conspirators are coming to the Victim in order to meet to facilitate the

scheme; therefore, I believe location evidence of **Target Cell Phone** will lead investigators to the location of these meetings.[6] I also believe it is likely that G. JACKSON, IRVIN, and/or other conspirators are procuring the money in cash,[7] and, because the Victim is incapacitated, that G. JACKSON, IRVIN, and/or other conspirators are likely traveling from the source of the money to the Victim. Therefore, I believe location evidence of the **Target Cell Phone** may also lead investigators to the source of the money used to fund the conspiracy.

### K. G. JACKSON's cell phone and the Victim's cell phone are both registered to G. JACKSON, suggesting that G. JACKSON gave the Victim a "burner phone" in furtherance of the scheme.

44.     G. JACKSON's cell phone, which is saved in BROWN's personal cell phone contact list as "Greg (bra)", is a Verizon number registered to G. JACKSON with date of birth 07/1977. I know, based on public record and law enforcement databases, that JACKSON's brother, G. JACKSON, was in fact born in July 1977.

45.     The Victim's phone number, (513) 858-5005, is a Sprint phone number also registered to G. JACKSON with date of birth 07/1977. Based on the registration, I believe it is likely that G. JACKSON procured this phone for the Victim to use to facilitate the scheme. I know, based on messages I reviewed from the Victim on BROWN's cell phone, including messages showing that the Victim requires extensive medical treatment and has had difficulty paying for a place to live, that the

---

[6] I know, based on my training and experience, that modern cell phones serve many functions, such as "wallets," and contain a vast amount of highly personal data, such as web history, text messages, call logs, photographs, and other materials. Therefore, individuals typically carry cell phones with them at all times, or keep them secured nearby. I believe it is highly likely that IRVIN carries the **Target Cell Phone** with him whenever he leaves his home.

[7] As noted above, based on my training and experience, and my knowledge of the investigation to date, I do not believe it is likely that G. JACKSON would attempt to withdraw large amounts of cash (such as $8,000.00) from any traceable source, such as a bank or loan company. I also know, based on my review of G. JACKSON's criminal history, that he has prior felony convictions for forgery and tampering with records, which indicates to me that he may have knowledge of illicit ways to procure funds, and/or may have contact with those who do.

Victim is likely experiencing financial distress. I therefore believe it is likely that G. JACKSON

provided the Victim with a "burner phone" to facilitate the payments. I further believe that IRVIN may

be assisting G. JACKSON in facilitating communication with the Victim given IRVIN's role in

procuring the affidavit from the Victim.

**L. The Target Cell Phone's location on certain dates significant to the criminal investigation of the September 19, 2019 shooting will help determine the who, what, when, where, why, and how of the crimes being investigated.**

46.     As described in detail above, I believe the **Target Cell Phone** belongs to IRVIN. I

further believe that IRVIN is one of the two men who went to the Victim's hospital room on October 31,

2019 with the typewritten affidavit recanting the Victim's identification of JACKSON as the shooter. I

also believe that the Victim exchanged text messages with BROWN in October 2020 describing how G.

JACKSON was involved in paying the Victim off in exchange for the Victim's silence. As noted above,

the first half of this payoff appears to have occurred before the January 8, 2020 dismissal of

JACKSON's state charges.  I further believe that, due to the Victim's extensive injuries and subsequent

near incapacitation, G. JACKSON, IRVIN, and/or other conspirators likely traveled to meet with the

Victim in order to facilitate the scheme. Therefore, there is probable cause to believe that evidence of

where the **Target Cell Phone** was at relevant times in the past will reveal that IRVIN procured the

typewritten affidavit before arriving at the hospital on October 31, 2019, and that he and/or other

conspirators subsequently provided the affidavit to JACKSON's state defense attorney. I also believe

that the location of the **Target Cell Phone** will reveal that IRVIN and/or other conspirators met with the

Victim regarding the payoff, the first half of which occurred prior to the January 8, 2020 dismissal of

Ohio's prosecution against JACKSON.

47.     In sum, I believe that the location of the **Target Cell Phone** between September 19,

2019—the date of the shooting—and March 1, 2020—after the state charges against JACKSON had

been dismissed and the federal charges initiated—will show that IRVIN met with other conspirators to procure the affidavit, met with the Victim at the hospital, facilitated the transfer of the affidavit to JACKSON's state defense attorney, obtained the money to pay off the Victim, traveled to where the payoff(s) occurred, and continued the scheme to end the criminal investigation into JACKSON. I also believe it is possible that IRVIN and/or other conspirators helped JACKSON dispose of the firearm JACKSON used to shoot the Victim since investigating officers never located the firearm at the crime scene nor at JACKSON's apartment. Location information of IRVIN's movements near the time of the shooting may provide clues as to how the firearm was concealed from law enforcement.

48.    I further believe that location information for the **Target Cell Phone** from October 1, 2020, through the present will reveal more recent meetings with conspirators and the Victim to facilitate the rest of the payoff, as described above in the text messages between the Victim and BROWN in October 2020. Because the federal criminal prosecution of JACKSON is ongoing with a trial date set for February 1, 2021, it is likely that the **Target Cell Phone's** location will reveal contacts between IRVIN, the Victim, and/or other conspirators in recent months to coordinate the final payoff and otherwise ensure the Victim's continued silence.

**M.** Sprint **likely has evidence relevant to this case, including information about the historical location of the Target Cell Phone**.

49.    In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and,

20

in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

50.     In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

51.     Based on my training and experience, I know that Sprint can collect cell-site data about the **Target Cell Phone**. I also know that wireless providers such as Sprint typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

52.     Based on my training and experience, I know that wireless providers such as Sprint typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Sprint typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phone's** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

53.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

54.     I further request that the Court direct Sprint to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Sprint who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

55.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to

destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

EDWARD SCHAUB
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me via reliable electronic means on        January 20    , 2021.

STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

23

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number 513-953-5123 ("the Account"), that are stored at premises controlled by Sprint ("the Provider"), headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.

# ATTACHMENT B

## Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **September 19, 2019, through March 1, 2020, and September 1, 2020 through present:**

    a.  The following information about the customers or subscribers of the Account:

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

2

        viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 922(g) (Felon in Possession of a Firearm) by Darias JACKSON on or about **September 19, 2019**; and violations of 18 U.S.C. §§ 2, 371, and 1503 (Conspiracy to Obstruct Justice); 18 U.S.C. §§ 2 and 1503 (Obstruction of Justice); 18 U.S.C. §§ 2 and 1512(c)(2) (Witness Tampering); and 18 U.S.C. § 1623(a) (Perjury) by Darias JACKSON, Jessica BROWN, Gregory JACKSON, Jearid IRVIN, and/or other unknown persons from on or about **September 19, 2019, through March 1, 2020, and September 1, 2020, through present.**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.